(C. D. 816)

SYNTHETIC PATENTS CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided December 1, 1943)

*Eugene R. Pickrell* for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Frank X. O'Donnell, Jr., Joseph B. Brady,* and *Robert C. O'Grady,* special attorneys), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

COLE, Judge: In our recent decision of September 10, 1943, in *Synthetic Patents Co., Inc.* v. *United States,* C. D. 803, we enunciated a legal principle for distinguishing between drugs and medicinal preparations, holding that the former connotes a material or substance useful for medicinal purposes, and the latter is a product with therapeutic qualities ready for medicinal use. The rule was announced in fixing the tariff classification, as a medicinal preparation, of a pancreatic hormone used to correct circulatory disorders in humans.

. The principle applied in the cited case is also controlling here. The instant case, too, involves a hormone possessing therapeutic properties and used for medicinal purposes; the issue presented is identical with that before the court in the previous case; and the line of proof introduced here somewhat parallels that offered there.

Like the hormone discussed in the case referred to, the commodity in question was classified by the collector as a medicinal preparation under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. 1940 ed: § 1001, par. 5), and assessed with duty thereunder at 25 per centum ad valorem. The protest makes several claims. Some have been abandoned and others were not pressed, either at the hearing or in brief. The claim which plaintiff stresses is the one for free entry

under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1201, par. 1669) as a drug in a crude state.

Several exhibits were offered and admitted in evidence at the trial, including samples of the imported merchandise in the condition as received in this country and in the form offered and sold commercially, but none of them is before us now, having been destroyed by fire in the sample bureau of the court. Their presence is not deemed essential for a proper determination of the case.

The testimony unfolds a very technical and highly interesting discussion. Dr. O. W. Barlow, conceded to be a qualified biochemist and pharmacologist, who is director of the biological research laboratory of Winthrop Chemical Co., affiliated with the plaintiff corporation, and the firm that offers and sells the imported merchandise under the trade name "Korotrin," appeared for the plaintiff. He testified that the particular hormone under consideration is known as chorionic gonadotropin, explaining that the word "chorionic" means placenta, which is "the foundation on which the fetus obtains its nourishment from the mother," and "gonadotropin" is a "trophic stimulant to * * * sex glands or sex structures." He stated that chorionic gonadotropin is obtained from urine of pregnant women, within the first 120 days of pregnancy, and that it is chiefly used to treat conditions peculiar to females, although some of it is applied to adjust conditions susceptible of males. The method by which the hormone is acquired was described by him as follows: Alcohol is added to the undiluted, fresh urine, thus precipitating the active hormone with a number of impurities. Following precipitation, the material is taken on a filter and dissolved in water which removes "the crystalloids and certain other poorly tolerated substances which are very unsatisfactory and actually somewhat poisonous." To remove undesirable colloids that remain with the active principle, the material is then dialyzed, using a cellophane sack as a dialyzing membrane, which is placed in pure distilled water, permitting the hormone to become isolated from the "colloids, or very, very large molecules" that are passed into solution. At this stage, the hormone is in a relatively pure state, but further purifying processes are applied and the product is ultimately brought to a solid state "by dehydration and low temperature and pressure."

After the imported commodity is received in the laboratory of Winthrop Chemical Co., it is assayed, under the supervision of the witness, Dr. Barlow, for potency and sterility, and also chemically, the chemical test being for moisture and the one for sterility conducted according to National Institute of Health methods. His explanation of the determination for potency may be summarized as follows: Comparative experiments are made between material recognized as standard by the League of Nations and the imported merchandise.

The importing label, indicating that the product in question contained 135,000 units to the gram, was accepted. The necessary solution was made so that a dose or unit, i. e., the quantity "when administered in 6 divided doses over a period of 3 days will produce certain physiological changes in the animals," would be contained in a total of one and one-half centimeters. Such a solution was injected into a group of 10 immature, female, albino rats "weighing from 45 to 55 grams in body weight." One hundred twenty hours after the preparation was administered a vaginal smear was obtained. The animals were then destroyed by anaesthetic and a laparotomy done, followed by an examination of the genital organs. The results from the known standard and the imported product were compared, and determination for strength made accordingly.

Following the assay referred to, the product is mixed with a quantity of milk sugar for a number of hours, until the mixture is perfect, "so that the potency would be some place in the neighborhood of eight to ten thousand units per gram." The adjustment is a reduction in strength of from one-twelfth to one-fiftieth of what it is on importation. In this condition, it is placed in sterile ampules or vials and marketed as "Korotrin," a product sold by Winthrop Chemical Co. in a container that includes, with the ampule holding a definite number of units of chorionic gonadotropin, a bottle of distilled water containing two-tenths of 1 per centum metacresol as a preservative and to maintain sterility, an air-filter needle, and a paper describing the conditions under which the active hormone may be prescribed. The witness expressed the opinion that the imported product could not be used medicinally "until it was proven satisfactory and diluted so that a suitable and tolerated dose could be administered," because it is too concentrated and "would produce local redness, heat and fever, ranging from one-half to two degrees Fahrenheit, which would last any place from 18 to 48 hours," but conceded, in answer to Government counsel's question, that even when administered as "Korotrin" it could cause local irritation.

The important points in plaintiff's testimony are the admissions that the therapeutic properties of chorionic gonadotropin remain constant from the time it is acquired in the raw state until its practical application by the doctor, and that from the time of importation until it is administered, the hormone in question may undergo dilution several times for adjustment to the proper strength for the person to be treated.

These vitally important statements are not only substantiated, but materially strengthened and clarified, by the very illuminating and competent testimony of defendant's witness, Dr. Ephraim Shorr, associate professor of medicine and head of the subdepartment of metabolism of Cornell University Medical College, whose broad

experience has included the study of hormone problems as a member of the Advisory Board to the Alien Property Custodian and in assisting the Food and Drug Administration of the Federal Government and the Council of Pharmacy of the American Medical Association. Referring to his experience with the particular hormone in question, the witness stated, "I have had experience with not only the substances in the experimental stage, but in the actual application of these substances as therapeutic agents in the human, in those conditions for which we have learned them to be suitable or potentially suitable," and added further, "I should estimate that the number of patients treated in my clinic over the past 10 years would number one hundred fifty or two hundred; that in many of these cases treatment has been administered over as long as 3 or 4 years in individual cases." He was questioned at length by counsel for plaintiff concerning his practical experience with chorionic gonadotropin and in the course of this examination testified that he had administered clinically in humans the identical medicine under consideration.

Dr. Shorr testified that the instant merchandise is chorionic gonadotropin, a protein hormone, with medicinal qualities, that it is obtained and processed from its raw state as outlined by plaintiff, and when used "exerts a definite physiological action applicable to certain diseases in men and women." The therapeutic properties of the hormone are never changed, and the manipulation after importation in no way affects its medicinal value. In answer to the direct question, "do you believe that the manipulations to which the imported product is subjected after importation into this country increases the therapeutic value or changes the therapeutic value of the imported merchandise?", the doctor replied, "I believe it does not alter it in the least," and his reasons therefor were given with such clarity and force we quote them verbatim: "that the hormone used is just exactly in the same state as when imported, and that the procedures carried out are only those (a) which are required by the American Medical Association's Council of Pharmacy and Chemistry, Food and Drug Administration and other Government agencies, which set standards by which the sterility and dosage of any medicinal is governed; and secondly, that they are merely those necessary to make any medicinal suitable for parenteral administration; in other words, that they are those processes by which it is made possible to give something underneath the skin. So there are two things that are done: the establishment of sterility, of activity for purposes, and those are required by law, and secondly, the making it possible for the physician to administer it under the skin. Now, those are the only two things done with respect to this compound, and none of these alter in the least the chemical nature or the therapeutic value of this compound."

The testimony of this witness concerning the purpose and the effect of the test for potency and sterility and the use of a diluent by Winthrop Chemical Co., is highly contradictory of that offered by plaintiff. It supports the following findings: The test for potency is one for activity and is conducted in accordance with governmental requirements in order that the medicament may be administered in terms of its strength. Its fundamental purpose is the determination of a therapeutic dose for the guidance of doctors who use chorionic gonadotropin in treatment of their patients. The test for sterility is to provide a proper vehicle, required under food and drug laws, when a substance is to be administered intramuscularly or subcutaneously; "It is merely what has to be done to make this injectable without getting bacteria into the circulation." The mixing of milk powder or milk sugar with the imported product does not give protection to patients from excessive irritation or severe reactions, but is done "for the convenience of the manufacturer dispensing the medication." Irrespective of the amount used with the hormone, the milk powder at all times remains an inert substance. It is the quantity of chorionic gonadotropin which has to be safeguarded, because its properties are entirely responsible for the effect produced from the use of the imported hormone as it is administered in solution. The use of a mixing agent is also advantageous from an economic standpoint. The imported merchandise is very costly and to pack it in ampules, by itself, in quantities in which it is sold, would make it difficult to handle and entail the risk of losing some of the valuable material. Moreover, the addition of the milk powder presents an attractive item and tends to promote sales.

The court recalls with satisfaction the demonstrations made by the witness in open court, which supported his oral testimony concerning the reasons for and the effect from the tests referred to. To illustrate the test for potency, he used a quantity of milk powder in a bottle (exhibit 5) representing the hermetically sealed imported product. In removing a very small quantity he stated that "in essence the principle of any test for potency is to determine activity and hence provide for a proper therapeutic dose, so that, of a well-mixed sample, with proper sterile conditions, a certain amount is taken out." He explained that the determination is "usually by animal experiment first, in which the lethal dose is determined and the pharmacological effect, and then going over to the human you determine how much aspirin a patient should be given, how much digitalis, how much nitroglycerin, how much of any substance," the result being a biological unit which serves as the guide in dispensing the medicine. The witness emphasized his statements regarding the test for sterility by producing samples of two products, i. e., a powder offered by Winthrop Chemical Co. under the name "Evipal"

(exhibit 6), used to induce anaesthesia, and a quantity of sodium Amytal powder manufactured by Lilly & Co. (exhibit 7), showing that each was offered with an ampule of sterile distilled water to insure compliance with the law that requires "when any substance is to be administered through the skin in any way, that the law requires, no matter what its purity, that it be tested for sterility and put up under sterile conditions, and that a vehicle equally sterile should be supplied with it." The witness' illustration to support the testimony concerning the use of a diluent was somewhat elaborate. Four bottles (exhibits 9, 9–A, 9–B, and 9–C) were produced, each containing a different quantity of milk powder equivalent in weight to amounts in which the imported product is offered as "Korotrin." The smallest quantity was .37 milligrams, representing 100 international units of chorionic gonadotropin, and the remaining were proportionately greater to equal 500, 1,000, and 5,000 international units. The witness showed how the use, without a diluent, of small quantities would be impractical for the manufacturer, and how the use of an inert substance with the larger quantities not only is a medium of convenience but also affords a definite check with requirements of the Food and Drug Administration. The illustrations displayed very graphically that the diluent has no influence on the practical value of the imported hormone for its medicinal purposes. The court admitted in evidence the various samples produced by the witness, as Judge Walker stated during the trial, "to get a photograph of this procedure," meaning the manipulation to which the imported commodity was subjected, to bring about the commercial product, "Korotrin."

The witness was subjected to a very rigid and exacting cross-exam ination with respect to the invoice description of the merchandise which he had stated was inaccurate. The product is described on the invoice as a "Concentrate of Pituitary Extract of Anterior Lobe Concentrate for Solution," and the witness disagreed with that identification because "the material obtained from the urine of pregnant women is manufactured not by the pituitary but by the chorionic villi, and as such it cannot be labeled an anterior pituitary extract" because it has different properties. Counsel for plaintiff, in attempting to discredit the witness' opinion, not only failed, but strengthened his testimony in chief.

We have given no consideration to the testimony elicited on cross-examination of defendant's witness with respect to commodities not involved here, because that phase of his testimony has no bearing on the present issue.

The court is greatly impressed with the proof offered by defendant and applies to it sufficient probative value to hold that the preponderance in weight of the evidence establishes that the treatment

applied to the instant merchandise in the foreign country removed it from its crude state and advanced it to a condition, which, at the time of importation, made it available for medicinal use, and that the laboratory work performed after importation did not change its therapeutic properties or enhance its medicinal value, but was merely a procedure followed for the benefit of the domestic manufacturer to make the imported hormone profitably marketable under the label "Korotrin."

Following our reasoning applied in the *Synthetic Patents Co., Inc.,* case, *supra,* we hold the merchandise in question to be properly classifiable as a medicinal preparation under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 5), as assessed by the collector.

The protest is overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.