(C. D. 845)

Synthetic. Patents Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided April 21, 1944)

*Eugene R. Pickrell* (*Eugene A. Chase* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

COLE, Judge: *Synthetic Patents Co., Inc.* v. *United States*, 11 Cust. Ct. 98, C. D. 803, distinguished, for tariff purposes, between drugs and medicinal preparations, stating that the former connotes "a substance or material used for medicinal purposes," and the latter "a product with therapeutic qualities, ready for medicinal use." The principle was applied in *Synthetic Patents Co., Inc.* v. *United States*, 11 Cust. Ct. 147, C. D. 813, holding cholic acid classifiable as an advanced drug, and in *Synthetic Patents Co., Inc.* v. *United States*, 11 Cust. Ct. 157, C. D. 816, fixing the classification of a protein hormone, known as chorionic gonadotropin, as a medicinal preparation.

The foregoing review of cases is set forth because the present issue is controlled by the statutory construction applied therein. Three different kinds of merchandise are involved herein. They are described on the invoices as "Ester of tachysterol," "4-nitrobenzoate of 7-dehydrocholesterin," and "3, 5-dinitrobenzoate of 7-dehydrocholesterin." All were classified as medicinal preparations under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 5), and assessed with duty accordingly, at 25 per centum ad valorem. Although several claims are made in the protests plaintiff chiefly relies on classification of the merchandise as drugs, either free of duty under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1201, par. 1669) as being in a crude state, or dutiable at 10 per centum ad valorem under paragraph 34 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 34), as being advanced in value or condition. Alternative claims are made that the goods are nonenumerated merchandise dutiable under paragraph 1558 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 1558), either as unmanufactured or manufactured articles.

There is some discussion in the testimony and in briefs concerning the provisions of paragraphs 27 and 28 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 27 and par. 28), relating to coal-tar products. Since, however, the said paragraphs were not considered in the collector's assessment, are not involved in any of plaintiff's

claims, and are now conceded by defendant to have no application in determining the tariff status of the instant merchandise, no purpose would be served in discussing the points suggested in connection therewith.

Winthrop Chemical Co., the firm that imported the merchandise involved in the three *Synthetic Patents Co.* cases, *supra,* is also the importer of the products in question, and the witness who testified in C. D. 813, *supra,* concerning cholic acid, also appeared here. In fact, at the beginning of the trial, it was agreed between counsel that the witness' qualifications set forth in the said case be incorporated herein.

Discussion will be given, first, to the product invoiced as "Ester of tachysterol." The testimony in connection therewith supports the following facts: Tachysterol is a commodity which the importer desires for its therapeutic properties and ultimate medicinal use to aid in correcting deficiencies of calcium in the blood. It is a natural constituent of yeast that has been exposed to sunlight, but because of its instability, it cannot be directly obtained from its source. It is necessary, using organic solvents, to extract ergosterol, plaintiff's illustrative exhibit A, from the yeast, which, after purification, is subjected to irradiation that is carried out in an inert solvent without the use of oxygen and "by ultraviolet light containing bands of the wave lengths from 2,500 to 3,100 Angstrom units." Although this may be accomplished by sunshine, the more practical method, and the one ordinarily followed, is to use "either carbon or mercury arc lamps which are obtainable on the market." Irradiation of ergosterol results in the production of a mixture of products, one of which is tachysterol. All are unstable compounds which possess the peculiar faculty of naturally changing into a new substance. Formation of the new products, in the order of their availability, was described by the witness as follows (p. 11):

Ergosterol is changed into lumisterol; lumisterol is changed into tachysterol; the next step is the formation of Vitamin $D_2$; then toxisterol is formed; and the final irradiation products are the Suprasterols I and II, and as long, as I said, as ergosterol is still present all of these irradiation products will be present in any solution which contains ergosterol.

Each of the irradiated products has the same empirical formula—the same number of carbon, hydrogen, and oxygen atoms in the molecule—as ergosterol. It is the arrangement of the molecules that is changed, having the effect of concentrating energy. Following irradiation, the unchanged ergosterol is recovered "by simply dissolving it in a mixture of ether and methanol," and after filtering and washing the process is repeated and an additional quantity of the combined substances is obtained.

The entire mixture of irradiated products is converted, with the use of 4-methyl dinitrobenzyol chloride, into their esters known as

"4-methyl 3, 5-dinitrobenzoic acid." To acquire the tachysterol the collection of esters is treated with methanol to remove excess acid, the residue being taken up in acetone in certain proportions and "then by a number of fractionated recrystallizations it is possible to remove the tachysterol as the 4-methyl 3, 5-dinitrobenzoate from the other irradiation mixture esters." Testimony elicited under cross-examination emphasizes that esterification of the ergosterol was not undertaken primarily for segregation purposes, but rather to obtain a stable compound for preserving the tachysterol during the period of shipment, the witness stating that "from a chemical point of view if you have a segregation in mind you would certainly not choose, for instance, an ester if you have to then run the mixture you obtain through 4 to 6 fractionated crystallizations, all of which are combined with a considerable loss to finally end up with your finished product." Tachysterol is the only commodity in the imported ester which is used. Its companion substance is discarded after importation, being merely a stabilizer, serving as a preservative throughout the period of transportation. The witness testified that during 4 years of experimentation the method followed herein is the only one found, permitting transportation of tachysterol, "one of the most unstable compounds I have ever come across in my chemical career." Plaintiff's brief explains the condition as follows:

Tachysterol is extremely unstable, and the only method of preserving it is by coupling it with another compound which acts as a stabilizer. In this form, as an ester of tachysterol, it can be separated from the other constituents by dissolving in solvents from which it will crystallize more readily than will the other constituents.

The record is sufficient for the conclusion that the importation of tachysterol in the form of the present shipment was to prevent its deterioration.

That tachysterol is a therapeutic agent is conceded in defendant's brief. Hence, the question for determination is whether its therapeutic properties are sufficiently adequate for tachysterol to be administered, as such, for its medicinal value; or, whether it is merely material that requires further processing to become a medicinal preparation. The issue is controlled, as hereinabove stated, by the rule applied in the *Synthetic Patents Co., Inc.*, case, C. D. 803, *supra*.

Plaintiff's uncontradicted testimony establishes that tachysterol does not possess sufficient therapeutic value for producing the physiological action required to correct or remedy a deficient condition. It is therefore necessary to treat the tachysterol after importation to obtain practical usage of its medicinal qualities. The witness' explanation of how this is accomplished may be summarized as follows: the stabilizing substance contained in the imported ester is removed by saponification, using an alcoholic alkali, and after discarding the acid salts and clearing the filtrate from the solvent, tachysterol is

restored to its condition existing after irradiation of the ergosterol in the country of exportation. The free tachysterol, thus obtained, is converted, by means of a reducing treatment with sodium and alcohol, into an entirely new compound known as dihydrotachysterol, which, in this state, is in an impure condition. The product resulting from the reduction process is purified by removing the alcohol, and then being treated with charcoal, filtered, and finally "run through a column of activated aluminum oxide which will retain impurities and let the dihydrotachysterol run through the column."

Dihydrotachysterol is the product used by the Winthrop Chemical Co., the practical value thereof being its therapeutic properties which are equal to those of the parathyroid gland, whose action is the guide for maintaining the proper calcium level in the blood. Before the dihydrotachysterol is prepared for commercial distribution, it is biologically assayed for sterility and toxicity in the laboratory of the importer. The test for sterility is conducted on chicks whose calcium level has been depleted, the result being the basis for finding whether the product possesses the strength necessary to restore a normal condition. Determination for toxicity is made using mice. As stated by the witness (p. 18), "That means mice are administered a certain quantity of the finished product and the amount necessary to kill the animal is determined. If this amount is below a certain figure the material is rejected." Following the assay, dihydrotachysterol is taken up in sesame oil to a commercial solution, which is sold under the label "Hytakerol" to "combat hypoparathyroidism" and as a remedy "to raise and maintain the calcium level in the blood within the normal physiological range."

From the foregoing, it is clear that the imported tachysterol—the product with which we are concerned for the purposes of the present issue—is not included within the class of articles having a tariff status of "medicinal preparation," under the decisions hereinabove referred to. In the *Synthetic Patents Co., Inc.*, case, C. D. 803, *supra*, a line of decisions was reviewed wherein different kinds of merchandise were held to be dutiable as medicinal preparations, and in connection therewith we said, "the courts have held imported merchandise properly classifiable as medicinal preparations where it was shown that the product in question required no chemical change or compounding with other medical ingredients, from its imported condition, for its medicinal use." That rule cannot be applied to the tachysterol in question. On the contrary, it does undergo a chemical change after importation to give its medicinal value practical application. In other words, it is a material with therapeutic properties that are greatly enhanced when converted into dihydrotachysterol, the medicinal preparation. Tachysterol is therefore, under the cited authorities, a drug, and having been removed from its crude state in the country of exportation by the

treatment described herein, it was advanced in condition and made readily available for further processing in this country. Accordingly, it is properly classifiable as an advanced drug under paragraph 34, *supra*, and dutiable thereunder· at 10 per centum ad valorem, as claimed.

The other two products included in this litigation are "just different esters of the same compound," and for the purpose of convenience will be referred to herein as Vitamin $D_3$. The testimony in connection therewith may be summarized as follows: Vitamin $D_3$ occurs in nature being "highly concentrated in the liver of fish and in the oil which can be obtained from fish liver, such as halibut liver oil, bass liver oil, whale liver oil, and a number of other fish liver oils." It has been found more economical and more convenient, however, to produce it synthetically from cholesterol. The synthetic method—the manner by which the instant merchandise was obtained—is "just a duplication of nature's process, only pressed into a shorter time." Cholesterol, also found abundantly in nature, is oxidized with chromic acid to form 7-ketocholesterol, that is reduced "by any convenient method to the corresponding secondary alcohol, which is designated either as 7-oxy or 7-hydroxycholesterol." The latter is subjected to pyrolytic treatment, i. e., decomposition by the application of heat, and "splits off a mole of water to form the 7-dehydrocholesterol," the direct source of Vitamin $D_3$. The 7-dehydrocholesterol is treated by irradiation under conditions similar to those applied to ergosterol, previously discussed, and the resulting mixture of esters is processed in substantially the same way as the substance obtained from irradiation of ergosterol, thus making available "the esters of irradiated 7-dehydrocholesterol or Vitamin $D_3$." The reason for importing Vitamin $D_3$ as an ester is the same as that for having tachysterol in a similar form. Vitamin $D_3$ is an unstable compound and "as a means of shipping" it is combined with "the nitrobenzoic acid ester." The companion substance with Vitamin $D_3$ serves no purpose other than as a preservative during the period of transportation, for after arrival of the imported product the esters are split therefrom by treatment with methanolic alkali and the free Vitamin $D_3$ is formed. At this time it contains many impurities which are removed by a further process, referred to by the witness as a "chromatographic analysis," and which is substantially the same as that applied to the imported tachysterol, hereinabove described. The witness explained the reason for this process as follows (p. 35):·

As I mentioned before, Vitamin $D_3$ is unstable, and even if saponification is carried out under very mild conditions and with exclusion of air some decomposition and some oxidation of the molecule takes place, and it has been found that such decomposition and oxidation products can conveniently be removed by such an absorption over activated aluminum oxide.

Following purification the residue, after being cleared of solvent, is "taken up in either oil or made up with diluents to make it possible to work it up in tablets, capsules, or it is used as an ingredient or dilution in elixirs of various sorts."

The testimony on use of the product is somewhat meager, being confined largely to the practice of the Winthrop Chemical Co., the witness' employer. It is as follows (p. 36):

Q. The Vitamin $D_3$ or the product that you obtain immediately upon saponi-fication of the imported esters, is that marketed as is?—A. No, it is not marketed as is.

Q. Is it suitable for administration in the form?—A. No, it is not.

Q. Why not?—A. First of all, it is not sufficiently pure. In addition, as I mentioned before, the marketed products of the Winthrop Chemical Co. and the other drug companies contain Vitamin D preparations in a unitage of up to 3,000 per gram, which is considerably above the accepted level of 5 to 700 units per day per growing child. The gram of pure Vitamin $D_3$ contains 40 mill. international units. So it is obvious that it is a practical impossibility to take the Vitamin $D_3$ as such and use it for medication, because even an amount of 300 units, which is 5 to 6 times in excess of daily requirement, would mean a fraction of a milligram. Very obviously, it is impossible to weigh out such a dose.

Q. Would such a dose be visible?—A. Hardly. With a magnifying glass, yes, if it ever could be weighed.

The witness referred specifically to two products of his company. One is labeled "Desynon A," an alcoholic solution containing 3,000 units of Vitamin $D_3$ per gram with "varying amounts of Vitamin A right now, 5,000 units of Vitamin A per gram," which is offered as a preventative of rickets in children. The other is marketed as "Cali-rad Wafers," a preparation composed of Vitamin $D_3$, calcium, and phosphorus, and offered as an aid for bone growth.

Evidently the above testimony was offered as an attempt to show that Vitamin $D_3$ is not capable of use by itself but must be combined with other therapeutic agents to be administered as a medicinal, thereby making its tariff classification controlled by the reasoning followed in *Synthetic Patents Co., Inc.* v. *United States*, C. D. 813, *supra*. That case involved cholic acid, an advanced drug whose sole use is "to correct deficiency in bile production." The facts disclosed that the commodity was not capable of use alone but had to be "combined with another substance, a spasmolytic agent with definite therapeutic qualities" to correct the condition to be remedied. It was therefore held not to be a medicinal preparation.

The record herein contains no comparable factual basis. The testimony is entirely too limited in scope for the conclusion that Vitamin $D_3$ cannot be effectively used by itself, but requires compounding with another therapeutic substance. The volume "The Pharmacological Basis of Therapeutics" contains a very interesting and enlightening discussion, clearly showing that Vitamin $D_3$ has curative qualities and is frequently used therefor. This publication

was referred to in cross-examination by defendant's counsel and was recognized by the witness as "reasonably accurate and reliable." In the chapter on Vitamin D, wherein the term is "used as a collective term for vitamins $D_2$ and $D_3$," the following appears at page 1286:

The curative dose of Vitamin D for the treatment of *fully developed rickets* is larger than the prophylactic dose. The average daily dose is 1,200 units, but again this may have to be raised appreciably in certain refractory cases. Indeed, there are reports in the literature of individuals requiring several hundred thousand units, but obstinate cases seldom require more than 50,000 units daily. Bacwin and coworkers (1940) reported an interesting case of refractory rickets which required a curative dose of 1,000,000 units and a maintenance dose of 440,000 units. Large doses of vitamin D should also be given when rapid healing is desired, as for example in a severe case of thoracic rickets in which respiration is embarrassed.

The above reference, coupled with the quoted testimony showing the potency of Vitamin $D_3$, lead to the conclusion that the product, of itself, possesses sufficient medicinal qualities to cure or correct certain physiological conditions. That it may be used with diluents or in combination with other medicinals is fully recognized. The record strongly indicates, however, that such commercial usages are adopted by manufacturers, like the Winthrop Chemical Co., for their benefit and convenience in marketing preparations under their own labels.

It is the medicinal value of Vitamin $D_3$ that is controlling for the purposes of this case. The present record contains nothing to suggest in the slightest way that the therapeutic properties of Vitamin $D_3$ are changed from the time it is first acquired until it is ultimately used. And the purification process, which plaintiff's counsel referred to as "rather elaborate," does not affect that conclusion. The witness' description thereof reveals nothing to infer that the medicinal properties are increased from the treatment applied in this country. Instead, the process has the effect of maintaining the therapeutic value of the product. Herein lies the vital distinction between tachysterol and Vitamin $D_3$. The testimony is very positive that the former requires additional processing after importation for effective use as a medicinal agent. Equally convincing is the fact that Vitamin $D_3$ undergoes no such change and requires none for therapeutic use.

For the reasons above set forth we hold the merchandise invoiced as "4-nitrobenzoate of 7-dehydrocholesterin," and "3, 5-dinitrobenzoate of 7-dehydrocholesterin" to be properly classifiable, under our cited decisions, as medicinal preparations under paragraph 5, *supra*, and dutiable thereunder as classified by the collector.

Counsel for defendant, in his brief, suggests that the importations might be "dutiable under paragraph 37, as esters of all kinds, not specially provided for, at 25 per centum ad valorem" (19 U. S. C. 1940 ed. § 1001, par. 37). It is true that the imported products are in fact esters, but the character and use of the active principle thereof

preclude a classification under the specific provision in paragraph 37, *supra*. Medicinal preparations and drugs are tariff provisions based on the use of imported commodities (*Synthetic Patents Co., Inc.*, case, C. D. 803, *supra*), and following a well-settled tariff principle such classifications prevail over an *eo nomine* designation (*Synthetic Patents Co., Inc.*, case, C. D. 803, *supra*).

Oral argument by counsel for the respective parties supplemented the briefs previously filed. At that time an analysis of the highly technical testimony and complicated questions involved were ably presented. In cases of this character the practice is to be encouraged.

The protests are sustained so far as they relate to the merchandise invoiced as "ester of tachysterol." In all other respects and as to all other merchandise they are overruled. Judgment will be rendered accordingly.