(C. D. 873)

SHERKA CHEMICAL CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided August 25, 1944)

*Eugene R. Pickrell* (*Eugene A. Chase* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Robert C. O'Grady,* special attorney), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

COLE, Judge: Plaintiff imported at the port of New York from Belgium a commodity invoiced as "Potassium oestradiol solution." It was classified by the collector as a chemical compound under paragraph 5 (19 U. S. C. 1940 ed. § 1001, par. 5), which provides:

PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

Plaintiff claims that the merchandise is classifiable as a drug, either free of duty as being in a crude state within the provisions of para-

graph 1669 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1201, par. 1669), which reads:

PAR. 1669. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, logs, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided*, That no article containing alcohol shall be admitted free of duty under this paragraph.

or dutiable at 10 per centum ad valorem as having been advanced in condition as contemplated by paragraph 34 of the said act (19 U. S. C. 1940 ed. § 1001, par. 34), providing as follows:

PAR. 34. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further*, That no article containing alcohol shall be classified for duty under this paragraph.

Two witnesses connected with the Schering Corporation, an affiliate of plaintiff corporation and a pharmaceutical concern whose business includes the marketing of sex hormones, supplied the only testimony.

The vice president of said corporation, a qualified chemist who is "either the author or co-author of a large number of patents concerning the isolation and the production of sex hormones," described the method of producing the imported merchandise, and its treatment after importation. His testimony supports the following summation: The source of the imported merchandise is pregnant mares' urine, containing, as its principal component, oestrone, in combination with other substances including the hormones "equilin, equilenin, hippulin, and so on," that are "present in a chemical combination with sulfuric acid and glycuronic acid." The conglomerate mass is decomposed by boiling the concentrate with hydrochloric acid, a mineral acid. The desired oestrone is extracted from the resulting mixture using ether, an organic solvent, that is ultimately eliminated "by certain crystallization procedures * * * in such a way that only oestrone, as such, is crystallized out of the mixture." The oestrone is dissolved in an alkali, potassium hydroxide, and as hydrogen is developed in

that liquid the oestrone is reduced to a mixture of alpha-oestradiol and beta-oestradiol. This strong alkaline solution, consisting of potassium hydroxide, beta-oestradiol, alpha-oestradiol, and water, is the imported merchandise.

Alpha-oestradiol and beta-oestradiol are chemical compounds identical in their composition but different in their properties. They possess the same empirical formula—the same number of carbon, hydrogen, and oxygen atoms—but in each the construction of the molecule is different. In chemical terminology, they are known as stereoisomers. Beta-oestradiol has no human value. Alpha-oestradiol is "identical with the hormone produced in the Graafian follicle" in human ovaries, but because of the presence of impurities and the strongly alkaline reaction which precludes its use either by injection or oral introduction, it is never used, as imported, with the combined substances.

To obtain the desired therapeutic agent, alpha-oestradiol, the imported merchandise is subjected to elaborate chemical processes in plaintiff's laboratory. The alkali is neutralized by the addition of hydrochloric acid to form potassium chloride that is easily soluble in water, while the oestrone, containing alpha-oestradiol and beta-oestradiol, is insoluble. To eliminate the beta-oestradiol, the precipitate is filtered and dried, then dissolved in methyl alcohol, or methanol, and finally combined with dissolved digitonin. The consequent chemical action produces alpha-oestradiol digitonide that is insoluble and comes out as a precipitate in a methanol solution, containing the excess digitonin and beta-oestradiol. To obtain the alpha-oestradiol from the newly formed compound, the combination is dissolved in pyridine, precipitating the digitonin with ether. As the alpha-oestradiol is finally isolated, it requires further recrystallization to attain the highest degree of purity. The beta-oestradiol is recovered and by further processing is converted into alpha-oestradiol.

Alpha-oestradiol is used by plaintiff in the manufacture of two products, Progynon-B (illustrative exhibit A) and Progynon-DH (illustrative exhibit B), that are offered to correct conditions peculiar to females, principally as remedies for menopause disorders. In the former, the active principle is combined with benzoic acid to form benzoic acid ester, and as such is dissolved, according to predetermined strength, in sesame oil. The solution is dispensed in ampoules and when administered is injected intramuscularly. In the latter, alpha-oestradiol is compounded with starch and milk sugar, and then pressed into tablets that are taken orally. The sesame oil in Progynon-B and the starch and milk sugar in Progynon-DH are merely inert carriers used to facilitate proper dosage requirements for the alpha-oestradiol, whose therapeutic properties remain unchanged

throughout. Its medicinal value is the same when it is offered under either of the said commercial labels as at the time of importation.

. The process just described is not only the one used by plaintiff, but it is also the principal method generally employed to make alpha-oestradiol available as a therapeutic agent. Each individual operation is essential to acquire the desired alpha-oestradiol. Proper treatment of the imported merchandise requires the technique of trained workers who "understand the chemical ways of dealing with such products." It is not an undertaking that can be successfully performed by the average physician for reasons which were stated in response to questions propounded by the court, as follows: (R. p. 24.)

Q. Exhibit A contains a leaflet with considerable descriptive matter to be used by the physician. Would it be possible to elaborate upon that and instead of giving this product, exhibit A, to the physician give him the raw alpha-oestradiol such as is imported, with the removal of everything except the real substance?—A. You mean if we would, as I mentioned, only precipitate the imported product with hydrochloric acid and obtain this mixture of alpha- and beta-oestradiol, could that be administered?

. Q. Could that be distributed to the doctor with an elaboration on these instructions?—A. It could be done.

Q. It could be done?—A. But the question is this: the beta-oestradiol, as I mentioned, is practically inactive, but it has not been studied to any degree as to whether other impurities may be present in these compounds which have any other effects. Now, the tendency in pharmaceutics today and therapeutics, I would say, is to go to the purest natural product because we know exactly what the natural product does. Now, these hormones are extremely important chemicals in the body because they really make—let us say in the case of a female sex hormone that is the thing which makes the difference between a child and a grown-up woman. If we have to obtain such actions we have to be extremely careful of handling only extremely pure substances. So the American Medical Association has always pointed out that these products should be as pure as possible. So we try to make these products. We have given considerable time and money and work to obtain the purest form possible, and that is alpha-oestradiol. The physician himself could not make the separation because, as I mentioned before, it is a very intricate chemical procedure. On the other hand, the potency of the product is, naturally, so much higher when it is pure. That is another point. We have to inject, for instance, less substance if we give the pure compound instead of impure compounds. * * *.

Q. Let me put it another way. * * *. Take exhibit A again and with the imported product before you after removing everything except the oestradiol—which is the value of this product, isn't it?—A. Yes.

Q. Now, then, before you associate that in a diluted form with some inert carrier could you put it in a bottle and distribute it to a druggist, for instance, and then issue instructions to a physician as to how he could use it with his patients without you handing him a diluted injection of that type?—A. That could be done.

Q. It could be done?—A. Yes, but the doctor would have great difficulty because, as you see here, one tablet contains .1 milligram and the doctor would have to buy some sizable amount which can be seen in a bottle; let us say a gram. Now, a gram would make the price probably—let us say probably $200 or $300 per gram which he would have to pay. Then he would have to go

to the pain of sitting down and weighing out .1 milligram to give it to his patient. This is an amount that you barely see. The patient would probably waste a lot of precious stuff which is, by the way, much more expensive than gold, to obtain the action. So I think that is just what the pharmaceutical industry does in making such things, brings them to a form where they can be easily handled. That is the only purpose with the tablets. But with Progynon-B there is another story. I have said that Progynon-B is a combination, or a benzoic acid, ester of oestradiol. The purpose of that is that the action is to a certain degree changed when you inject such a substance, it acts very fast because the body tries to get rid of it and excretes it fast.

Dr. Max Gilbert, a practicing physician, associated with the Medical Research Division of the said Schering Corporation, who has devoted much study to the clinical application of hormone preparations, including oestradiol, offered much corroboration of the testimony of the previous witness, and some modification thereto. His testimony supports these conclusions: Alpha-oestradiol and beta-oestradiol are stereoisomers—i.e., possessing the same gross composition of carbon, hydrogen, and oxygen, but differing "in the space configuration of the atoms," and imparting entirely different physiological actions. An oestrogenic substance is one which has certain definite actions on the female genital tract, in particular on the epithelium of the vagina and on the lining of the uterus, which is called the endometrium. Professional experience of the witness has proved that alpha-oestradiol and oestrone are oestrogenic substances that are administered as treatment for the same disorders; that the former is twelve times more potent than the latter, and is preferable in cases in which very high doses of oestrogenic preparations are required, because of the desirable practice to administer a smaller and more convenient dosage where possible. Conditions under which alpha-oestradiol is prescribed were described as follows: (R. p. 33)

In general, alpha-oestradiol is administered in many cases in which there is a deficiency of the oestrogenic hormone naturally originated by the body. That is particularly true in the menopause in women, and that is one of the most important uses of this hormone, the treatment of menopausal symptoms. It is also used in the treatment of various menstrual disorders. It is used in the treatment of gonorrheal vaginitis in children and of senile vaginitis in old women.

The imported merchandise, "an aqueous solution of 80 to 90 per centum alpha-oestradiol and 10 to 20 per centum beta-oestradiol in a potassium hydroxide aqueous solution, with a pH of 10 to 13" could not be administered because a solution of that degree of alkalinity is corrosive to the tissues, very irritating to the tissues and it cannot be administered either by injection or orally in that form unless it were changed by acidification, which would render the substance more pleasing and less disturbing to the patient. One of the reasons for such adjustment after importation is to make the solution more tolerant. Nor would the removal of the alkaline, leaving a combination of 80

to 90 per centum alpha-oestradiol and 10 to 20 per centum beta-oestradiol, produce a mixture ready for practical application because correlated substances tend "to produce carcinoma, malignant growths, and in order to avoid any possibility of danger from that source it is desirable to have the preparation pure so that its properties are definitely known," and this is especially important in view of the principal use of alpha-oestradiol as a remedy for menopause disorders occurring most frequently in women of middle age who are more susceptible to cancer than younger women. The great potency of the merchandise also requires the highest degree of purity to insure exact dosages. To obtain accurate results along this line, the practice has developed to express dosages in terms of milligrams, by weight, rather than in biological units, a less exacting method, because "not only undesirable but actually harmful effects may be produced by over-dosage." The average physician or pharmacist is unable to prepare the imported merchandise for dispensation as plaintiff does, because the operations for transforming the mixture into material suitable for therapeutic use would be so complex that the average physician or average pharmacist could not carry them out. Some of the difficulties to be encountered by the physician who attempts such practice were explained under the following examination by the court: (R. p. 46)

Q. * * * Is the reason why, Doctor, it would not be safe, * * * for a doctor to administer this product as imported because of the difficulty in measuring it accurately due to the fact that the impurities are present and have not been removed?—A. Yes, that is the reason.

Q. That is correct?—A. Yes.

Q. Well, if you have a quantity of the imported product before you why can't you take just a very small fraction of it and determine the percentage of impurities and then base your instructions to the doctors accordingly? There would not be anything difficult about that, would there?—A. It would be very difficult to ascertain the fraction so that the amount could be expressed, of alpha-oestradiol could be expressed in milligrams.

Q. Well, you figure 80–20.—A. Roughly.

Q. Roughly. So that you can determine whether it is 80–20 or 90–10, or whatever it happens to be, by taking a small percentage of the imported gross, imported quantity, and then determine the impurities present. After that is done I do not understand why, if at all, there is any difficulty for a doctor to then follow the instructions which you could give him as to the milligram formula that he should follow, taking into consideration as you would, the percentage of impurities.—A. Well, in the first place, it would be necessary to determine the relationship of the pure substance to the impurities for each lot. That would vary from lot to lot and would have to be determined in each case. Since in each case it is rather a difficult operation it would involve a very great amount of work. Also the nature of the impurities, as I think I mentioned before, is something that might be of concern as possibly producing some undesirable effects.

The witness agreed with previous testimony to the effect that alpha-oestradiol is in the same condition when present in the commercial products offered by plaintiff as it was at the time of importation.

Processing of the instant merchandise after importation and its preparation for ultimate use under commercial labels have been set forth to clarify and simplify discussion of the legal phase of the case. It is fundamental that the condition of merchandise at the time of importation controls its tariff classification, and this principle is highly significant in determining the present issue.

*Synthetic Patents Co., Inc.* v. *United States*, 11 Cust. Ct. 98, C. D. 803, involving classification of a pancreatic hormone, distinguished between medicinal preparations and drugs, for tariff purposes, and although the identical issue is not before us—the instant merchandise having been classified as a chemical compound—the rule enunciated therein is the foundation for the statutory construction to be applied here. In the cited case, we held that a drug is a substance or material used for medicinal purposes, and a medicinal preparation is a product, with therapeutic quantities, ready for medicinal use. The rule has been followed in a series of recent cases. Pertinent ones are reviewed, *infra*. In *Roche-Organon, Inc.* v. *United States*, 12 Cust. Ct. 164, C. D. 848, the following important comment was made upon that interpretation:

In applying this rule, the medicinal value of the imported product has been the controlling factor. If it possessed sufficient therapeutic properties at the time of importation, and underwent no chemical change between then and its ultimate medicinal use, it met the statutory meaning of a medicinal preparation. That it was compounded with some inert substance after importation, to facilitate its application, did not affect this conclusion.

The principle was invoked in *Synthetic Patents Co., Inc.* v. *United States*, 11 Cust. Ct. 157, C. D. 816, holding a protein hormone, known as chorionic gonadotropin, to be a medicinal preparation after finding, as a matter of fact, "that the treatment applied to the instant merchandise in the foreign country removed it from its crude state and advanced it to a condition, which, at the time of importation, made it available for medicinal use, and that the laboratory work performed after importation did not change its therapeutic properties or enhance its medicinal value, but was merely a procedure followed for the benefit of the domestic manufacturer to make the imported hormone profitably marketable."

The *Roche-Organon* case, *supra*, determined the classification of an oestrogenic hormone, a substance "obtained from urine of pregnant mares collected between the sixth and ninth month of pregnancy that extends over 11 months," and whose use is comparable with the alpha-oestradiol acquired from the imported merchandise under consideration. It was established of record that "the therapeutic properties of the imported product was sufficient, without any other medicinal agent or ingredient, as a remedy for the conditions described herein," and

under the rule laid down in the *Synthetic Patents* case, C. D. 803, *supra,* the merchandise was classified as a medicinal preparation.

The hormones under consideration in the three cited cases comprised the imported product. In none of those cases was the active therapeutic agent combined with another substance having definite properties of its own. That is not true of the instant importation. There is no dispute that the imported substance now before us consisted of alpha-oestradiol, beta-oestradiol, and potassium hydroxide, in an aqueous solution, which plaintiff concedes to be a "mixture of chemical compounds." Just why this combination was imported is not disclosed. Plaintiff's counsel, in his brief, states that "it (alpha-oestradiol) has probably been advanced to a stage beyond that necessary for transportation or preservation, since it has been separated from other hormones in the pregnant mares' urine and converted from the excreted form of oestrone to the original form of alpha-oestradiol," which indicates that the alkaline was not added as a preservative for the valuable alpha-oestradiol. In this respect, the present importation differs from the tachysterol, classified as an advanced drug in *Synthetic Patents Co., Inc.* v. *United States,* 12 Cust. Ct. 148, C. D. 845, which was imported in combination with a substance "discarded after importation, being merely a stabilizer, serving as a preservative throughout the period of transportation."

Although plaintiff recognizes the present importation as a combination of substances, admitting it to be "a mixture of chemical compounds," it is claimed that the merchandise is more specifically provided for as a drug, a provision predicated on the use of a product. The term "drug" as used in the statute, paragraphs 1669 and 34, *supra,* contemplates a substance "having therapeutic or medicinal properties and chiefly used for medicinal purposes," and under our interpretation of the term, as hereinabove set forth, it is a material, as distinguished from a finished product, used for medicinal purposes. Applying such controlling statutory principles to the imported product, it becomes clear at once that the proposition advanced by plaintiff is without merit. The merchandise, as it arrived in this country, is not a therapeutic substance. Nor is it material used for medicinal purposes. True, it contains the highly potent and very valuable medicinal, alpha-oestradiol, but this therapeutic agent, as imported, is not capable of medicinal use. It is not only associated with a powerful alkaline which prohibits such use, but is also combined with a closely allied substance, beta-oestradiol, which must be eliminated for the alpha-oestradiol to have medicinal value. Until the alpha-oestradiol is isolated from the components with which it is associated in the imported solution, its therapeutic properties have no practical value. It is not until after the imported commodity has been received in plaintiff's laboratory, and there subjected to com-

plicated processing, which includes subjecting the alpha-oestradiol to chemical changes, that the desired therapeutic agent becomes available for actual medicinal use.

The fact is—and it is conceded by plaintiff—that the imported merchandise is a mixture or combination of chemical compounds, not specially provided for. As such, it is specifically provided for in paragraph 5, *supra*, and dutiable at the rate assessed by the collector.

The protest is overruled and judgment will be rendered accordingly.