SHERKA CHEMICAL CO., INC. *v.* UNITED STATES (No. 4493) [1]

[1] C. A. D. 316.

United States Court of Customs and Patent Appeals, July 3, 1945

*Eugene R. Pickrell* for appellant.

*Paul P. Rao,* Assistant Attorney General (*Richard F. Weeks,* special attorney, of counsel), for the United States.

[Oral argument April 11, 1945, by Mr. Pickrell. and Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, overruling the protest of the importer and sustaining the classification of, and duty assessment upon, certain merchandise invoiced as "Potassium oestradiol solution" made by the Collector of Customs at the port of New York City—the port of entry. It was imported in 1939 and, therefore, is subject to the provisions of the Tariff Act of 1930.

The collector's classification was under paragraph 5 of the act which reads:

PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

It is specifically stated in the collector's return to the trial court that it was "classified as  *  *  *  non-alcoholic chemical compound n. s. p. f.  *  *  *  at 25% under paragraph 5  *  *  *."

The protest of the importer in its final form embraced alternative claims, including one for free entry under paragraph 1669 of the act, and one for classification as a nonenumerated manufactured article under paragraph 1558, but the only claim pressed before us is for classification under paragraph 34, which reads:

PAR. 34. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided,* That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further,* That no article containing alcohol shall be classified for duty under this paragraph.

Paragraph 1669 is named in appellant's assignments of error but it was not insisted upon before us. Appellant's brief also asserts the

alternative claim under paragraph 1558, but there is no sufficient assignment of error relating thereto.

So, the only issue before us is between paragraphs 5 and 34, *supra*. The description of the substance as given by expert witnesses called on behalf of the importer naturally bristles with technical terms. It seems to have been fairly described in a written memorandum submitted to the trial court by importer's counsel, in lieu of a preliminary statement, at the beginning of the trial, and we quote therefrom the following:

The merchandise covered by this protest, invoiced as potassium oestradiol solution, consists of a mixture of alpha-oestradiol and beta-oestradiol in alkaline solution. * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Alpha-oestradiol is the natural female sex hormone formed in the Graafian follicle. When excreted from the body it is largely in the related form of oestrone. The source of the imported product is pregnant mare's urine. By extraction with organic solvents, the oestrogenic hormones, including oestrone, equilin, equilenin, hippulin, and oestradiol, together with other phenolic substances, are obtained. By recrystallization, the oestrone is largely separated from the other extracted substances. This oestrone is dissolved in potassium hydroxide and reduced to the original oestradiol form. This solution is the imported product.

It contains a mixture of 80 to 90 percent alpha-oestradiol, 10 to 20 percent beta-oestradiol, and traces of other estrogenic horomes. Alpha-oestradiol is the fundamental estrogenic hormone and is twelve times as potent as oestrone. Beta-oestradiol is practically impotent.

The imported solution is not suitable for administration, because of its high alkalinity, nor is the mixture of the two oestradiols suitable for administration medicinally after removal from the solution, because the administration of anything other than the desired hormone in the purest possible form may lead to undesirable results.

After importation the mixture of oestradiols is precipitated from solution with acid. This material is dissolved in alcohol and digitonin is added. Upon standing, alpha-oestradiol digitonide crystallizes out of solution, but the beta-oestradiol remains in solution. The crystals are removed, dissolved in pyridine and ether added. This decomposes the digitonide, precipitating the digitonin. Alpha-oestradiol is then obtained from the solution and purified by re-crystallization.

This product is put up in tablet form with inert fillers for oral administration as Progynon-DH, and is converted into alpha-oestradiol benzoate, which in sesame oil solution is sold as Progynon-B, and is used for intramuscular injection. The relatively inactive beta-oestradiol is changed again to the form of oestrone and reduced to a mixture which will contain 80 to 90 percent alpha-oestradiol and 10 to 20 percent beta-oestradiol. This is again treated as outlined above.

Alpha and beta-oestradiol are stereoisomers, that is, they have the same empirical formulae, but a different space configuration of the atoms in the molecule.

The testimony of the importer's witnesses subsequently called substantially supports the foregoing. No testimony was taken on behalf of the Government.

Upon the basis of the description and the testimony, it is contended on behalf of appellant that the substance, in its condition as imported, falls within the particular phraseology of paragraph 34, reading:

* * * all other drugs of * * * animal origin * * * not edible,

and not specially provided for  *  *  *  advanced in value or condition  *  *  * 10 per centum ad valorem.

The Government contends to the contrary, and in its brief states in effect, that it is necessary for the court to determine the meaning of the first *proviso* of paragraph 34, *supra*, reading, *"Provided,* That the term 'drug' wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes."

Counsel for the Government, in effect, contend that a substance, in order to fall within the so-called definition stated in the quoted *proviso*, must be a substance which, in its imported condition, is *ready for medicinal use without further processing,* and this, as we understand it, was the view taken by the trial court which analyzed the testimony at great length and in its decision cited and discussed its prior decisions in the cases of *Synthetic Patents Co., Inc.* v. *United States,* 11 Cust. Ct. 98, C. D. 803; *Synthetic Patents Co., Inc.* v. *United States,* 11 Cust. Ct. 157, C. D. 816; *Roche-Organon, Inc.* v. *United States,* 12 Cust. Ct. 164, C. D. 848, in each of which a question somewhat analogous to that here at issue was involved. The decision recites that in the first *Synthetic Patent Co., Inc.* case, *supra,* "we held that a drug is a substance or material used for medicinal purposes, and a medicinal preparation is a product, with therapeutic quantities [qualities?], *ready for medicinal use"* [italics ours], and stated, in effect, that the rule so enunciated had been followed in the other cited cases and "is the foundation for the statutory construction to be applied here."

No one of the decisions so cited by the trial court was appealed, and we are here called upon for the first time specifically to state our interpretation of the quoted *proviso.* It appears to have been involved, to an extent, in the case of *Vandegrift & Co.* v. *United States,* 13 Ct. Cust. Appls. 30, T. D. 40865, hereinafter referred to, but no interpretation of it such as is here contended for by the Government seems to have been there sought.

(The last *proviso* of the paragraph is in no way involved here, it being conceded that the substance at issue, as imported, did not contain alcohol.)

We are unable to agree that a substance in order to fall within paragraphs 34, *supra,* and 1669 of the act must, in its imported condition, be ready for use without any further processing.

It will be observed that the so-called definition in the *proviso* under discussion is not limited to the paragraph (34, *supra*) in which it appears but is applicable *"wherever used in this Act."* [Italics ours.]

We find the term "drugs" in three paragraphs of the act, viz, paragraphs 23, 34, and 1669.

It seems clear that such drugs as are covered by paragraph 23 which (like paragraphs 5 and 34, *supra*) is one of the paragraphs of

schedule 1—Chemicals, Oils and Paints—are finished drugs ready for use in their imported condition.

The drugs provided for in paragraph 1669 (a free-list paragraph) are those "which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, *not* advanced in value or condition * * *." [Italics ours.]

It would seem that if the *proviso*, which must be applied to paragraph 1669, be interpreted as the Government contends it should be, and as the trial court seemingly held, the effect of such interpretation would be to completely emasculate that paragraph. No item of the paragraph, whether designated *eo nomine* or included under the general language, "and all other drugs of vegetable or animal origin" is, in its imported condition, ready for use for medicinal purposes.

The drugs enumerated, whether *eo nomine* or in general language, in paragraph 34, *supra*, are substantially the same, and are arranged in the same order, as those designated in paragraph 1669, but paragraph 34 applies to those which *are* advanced in value or condition.

As we view it, the Congress provided for different drugs under that specific term in three different stages, dependent upon their imported condition. In paragraph 1669 it provided for the admission free of duty of drugs in a crude state. In paragraph 34 it provided for drugs advanced beyond the crude state but not necessarily ready for use without further processing and imposed a duty of 10 per centum ad valorem thereon. In paragraph 23 it provided for certain finished drugs ready for use and imposed a duty of 25 per centum ad valorem thereon.

We are further of opinion that by the *proviso* in paragraph 34, made applicable to all the paragraphs of the act in which the term "drug" or "drugs" (the use in the plural form being of no consequence in construing the language) appears, sought to make it clear that any substance to be classifiable as a drug under any one of those paragraphs must have therapeutic or medicinal properties and be chiefly used for medicinal purposes.

For example, both paragraphs 34 and 1669 include "beans" as a drug. There are many kinds of beans. Some are edible; some are not edible, but do have therapeutic or medicinal *properties*. Congress obviously intended that edible beans having no therapeutic or medicinal properties should be excluded from the drug paragraphs. The same may be said of berries, buds, bulbs, fruits, flowers, and other articles designated *eo nomine* in the paragraphs. Furthermore, it should be noted that paragraph 34, in addition to designating various substances *eo nomine*, contains, like paragraph 1669, the clause "and all other drugs of vegetable or animal origin," and the *proviso*, of course, applies to that clause.

The three paragraphs named do not cover all drugs or drug substances. Numerous substances which are named as drugs in the "Pharmacopoeia of the United States" are specially provided for in other paragraphs. Familiar examples are asafetida and ipecac named in paragraph 35 and digitalis named in paragraph 36.

It is obvious that the *proviso* under discussion is not an all inclusive definition of the term "drug." It is an excluding provision so far as paragraphs 23, 34, and 1669 are concerned. It merely excludes from classification under those paragraphs substances not having therapeutic or medicinal properties and not chiefly used for medicinal purposes. It does not say, nor in our opinion does it mean, that unless such substances are "ready for use" in their imported condition they are excluded.

We deem this a proper case in which to examine, to some extent, legislative and judicial history relating to the subject matter.

The *proviso* under discussion first appeared legislatively in paragraph 34 of the Tariff Act of 1922.

In that act various changes from the 1913 act were made in the arrangement of the chemical schedule, including the drug paragraphs.

The Summary of Tariff Information 1921 (prepared for the use of Congress in its consideration of the bill which became the 1922 act), at page 91, states:

> *Important changes in classification.*—As the term "drugs" has under past acts been interpreted in different ways, it has been defined as applying only to articles having chief use in medicine. Gums were omitted, as they are seldom used medicinally. The provision for all other drugs was expanded to include those of animal origin. (Reclassification Report, p. 39.)

In the *Vandegrift & Co.* case, *supra*, which arose under the Tariff Act of 1922, there was involved the classification of certain glands and different organs of animal origin which had been classified by the collector under paragraph 34 of the act and which was claimed to be free of duty under paragraph 1567 (substantially the prototype of paragraph 1669 of the 1930 act). The matter of the substances being "drugs" in some form seems to have been conceded in that case and the only issue was whether they were in a crude or advanced stage. They obviously were not "ready for use" in their imported condition.

In the Summary of Tariff Information 1929 (prepared for the use of Congress in connection with the bill which became the Tariff Act of 1930), vol. 1, page 164, we find the following statement (relating to paragraphs 34 and 1567 of the 1922 act, subsequently carried into the 1930 act):

> * * * Paragraph 34 includes drugs (not elsewhere specially provided for) advanced in value by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and prevention of decay and deterioration pending manufacture.

The term drug, as used in paragraphs 34 and 1567, embraces expressly and by implication a large number of plants and parts of plants, and a smaller number of animals and parts of animals, used chiefly for medicinal purposes, rather than as foodstuffs. The crude drugs are almost invariably processed further before they can be used as medicine.

We find that the United States Customs Court (First Division, but composed of different judges from the present First Division), itself, in a case not appealed (*Atlantic Coast Fisheries Corp.* v. *United States*, 6 Cust. Ct. 415, C. D. 506, decided June 3, 1941) which involved, in part, mixtures of fish-liver oil and certain vegetable oils, interpreted the *proviso* as follows:

That the oils in question have therapeutic properties we believe is amply established by the record. We are satisfied that the phrase "chiefly used for medicinal purposes" does not limit the application of paragraph 34 to such drugs as are in their imported condition *ready* to be used for medicinal purposes. It will be noted that the definition states that "the term 'drug' *wherever used in this act* shall include only those substances * * * chiefly used for medicinal purposes." The term is used in paragraph 1669 of the free list referring to drugs in a crude state, obviously not ready at the time of importation to be used for medicinal purposes. Likewise, in paragraph 34, *supra*, the drugs covered thereby are such as are "advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration" thus covering drugs which have been advanced in value or condition but which are not necessarily in their finished or highest state, ready for use for medicinal purposes. We must conclude, therefore, that the phrase "chiefly used for medicinal purposes" was intended to denote the character of the substance intended to be covered by the term "drugs" and not to limit the use of the term to such substances as are ready to be used for medicinal purposes at the time of importation without further processing.

The mixtures there involved had been classified by the collector under paragraph 57 of the Tariff Act of 1930. The court held them classifiable under paragraph 34, *supra*.

In the case of *Geo. S. Bush & Co., Inc.* v. *United States* (No. 4455), 32 C. C. P. A. (Customs) 56, C. A. D. 285, decided by us June 19, 1944, there was involved dogfish-liver oil, produced in the manner therein described. It had been classified by the collector as drugs (or as a drug) advanced in value, under paragraph 34, *supra*. The importer's claim was for classification under paragraph 1669 as a crude drug. The principal controversy in that case related to the imposition of an internal revenue tax, as was the situation in the *Atlantic Coast Fisheries Corp.* case, *supra*, but in both cases the question of classification was involved.

No question was raised there as to the substance being a drug, the only question being whether it was crude or advanced. So, the issue presented here was not passed upon there, but it was there held, in effect, as stated in the syllabus, that " * * * the provision for drugs, advanced in value or condition, contained in paragraph 34

covers articles *according to the use to which they are put*" [italics supplied here], and that the provision was more specific for the dogfish-liver oil than the provision for fish oils in paragraph 52 of the act.

That holding we deem pertinent to the instant case.

We are of opinion that the record in this case clearly shows that the substance involved has "therapeutic or medicinal properties" and that it is chiefly—indeed solely—used for medicinal purposes.

Therefore, we think it is a drug of animal origin "advanced in value or condition" and as such it is more specifically provided for in paragraph 34 than in paragraph 5.

The judgment of the Customs Court is *reversed* and the cause is *remanded* for further proceedings consistent with this decision.