(C. D. 1071)

INTERNATIONAL VITAMIN CORP. *v.* UNITED STATES

United States Customs Court, First Division

(Decided November 26, 1947)

*John D. Rode* for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*John J. McDermott* and *Richard F. Weeks*, special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Merchandise invoiced as "Unirradiated Ergosterol" was classified as a medicinal preparation under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 5), and accordingly assessed with duty at 25 per centum ad valorem. When the case was called for trial, Government counsel repudiated the collector's classification with the explanation that the instant merchandise has no therapeutic properties and is not used for medicinal purposes, and consequently cannot be classified as a medicinal preparation. Defendant now contends that the merchandise is classifiable under said paragraph 5 as a chemical compound, not specially provided for, and dutiable at the rate applied by the collector.

Plaintiff concedes that the substance in question is a chemical compound, but claims that it meets the statutory definition of a drug, i. e., "those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes," paragraph 34 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 34), and is either free of duty under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. §1201, par. 1669), as being in a crude state, or dutiable at 10 per centum ad valorem under paragraph 34, as advanced in condition.

Government counsel's concession that the collector's classification is erroneous removes any presumption of correctness ordinarily attached to such official action. The admission by counsel is tantamount to a report by the collector changing his original classification, no longer presumed to be correct. *Smith & Nichols (Inc.)* v. *United States*, 18 C. C. P. A. 16, T. D. 43974. As we review the evidence herein, it will be considered free from any influence usually attached to the collector's classification.

Plaintiff's case is embodied in a written stipulation (exhibit 1), wherein the parties agree that the merchandise "consists of unirradiated ergosterol, the same in all material respects as the ergosterol represented by plaintiff's illustrative exhibit A in protests 65451–K, etc., *Synthetic Patents Co., Inc.* v. *United States*, 12 Cust. Ct. 148, C. D. 845, decided April 21, 1944; that the said unirradiated ergosterol was extracted from yeast by the use of organic solvents and that the said ergosterol is subjected to the same treatment and used for the same purposes as stated in the opinion in the *Synthetic Patents Co.*

case, *supra.*" It was further stipulated that the record in the cited case may be admitted in evidence.

The incorporated case was concerned with the tariff classification of tachysterol. The record therein refers to unirradiated ergosterol, the merchandise involved herein, only to the extent Dr. Wolfgang Huber, a well-qualified research chemist, described the process by which tachysterol is obtained.

Testimony in the incorporated case, as it related to ergosterol, shows that it is an ingredient of natural yeast, that after extraction, it is purified and then subjected to irradiation that is carried out in an inert solvent without the use of oxygen and "by ultraviolet light containing bands of the wave lengths from 2,500 to 3,100 Angstrom units." Although irradiation may be accomplished by sunshine, the more practical method, and the one ordinarily followed, is to use "either carbon or mercury arc lamps which are obtainable on the market."

Irradiation of ergosterol results in the production of a mixture of products, all unstable compounds possessing the peculiar faculty of naturally changing into a new substance. As stated by Dr. Huber "by this irradiation process as long as any ergosterol is still present a number of irradiation products are formed, namely, ergosterol is changed into lumisterol; lumisterol is changed into tachysterol; the next step is the formation of Vitamin $D_2$; then toxisterol is formed; and the final irradiation products are the Suprasterols I and II, and as long, as I said, as ergosterol is still present all of these irradiation products will be present in any solution which contains ergosterol." The testimony concerning the effect of irradiation is quoted:

Q. What is the difference between the various irradiation products of ergosterol and ergosterol itself?—A. They are all isomers of ergosterol. That means they have the same empirical formula. However, the space arrangement of the molecules is different in any of the aforementioned compounds, such as ergosterol, tachysterol, Vitamin D, and suprasterols.

Q. In other words, the process of irradiation sort of bends the atoms around a bit?—A. That is correct. Irradiation energy is fed into the molecule, and the molecule is converted as a more unstable form, a form which contains more energy in it. By accumulation of this energy finally the ring structure breaks, and the typical 4-ring system of the sterols is transformed in the typical 3-ring system of the irradiated sterol of the Vitamin D and tachysterol class containing a system of conjugated double bonds.

In the present case, defendant offered the testimony of two witnesses. Dr. George Dobbs is a doctor of medicine employed by the United States Food and Drug Administration as medical officer of the Eastern District. He is familiar with unirradiated ergosterol as a substance and with the irradiated products of yeast. His experience with ergosterol was acquired during the course of his official duties, when he became "familiar with the medical literature on the subject of ergosterol, particularly so since various modifications of that com-

pound are subject to regulation under the Federal Food, Drug, and Cosmetic Act."

He testified that yeast, the natural source of ergosterol, possesses therapeutic value, that the chief use of irradiated ergosterol is for medicinal purposes, but that unirradiated ergosterol, the merchandise in question, has no therapeutic value. The opinions were based on medical literature and official tests recognized by the United States Pharmacopoeia which clearly show "that the unirradiated ergosterol has no therapeutic property in promoting the healing of bones in animals in which rickets has been produced by virtue of depriving them of that substance, whereas irradiated ergosterol very definitely exercises that therapeutic property." The reaction that takes place when ergosterol is irradiated was described as a "change in the internal molecular structure which occurs as a result of the energy of the ultra-violet light within a certain wave length only hitting the interior structure of the atom or molecule of that substance." Ergosterol is recognized as a "pro-vitamin", i. e., "a substance to which something may be done to give it the vitamin activity which it does not possess before that something is done to it." The empirical formula— the number of carbons, hydrogen, and oxygen atoms—is the same, both in unirradiated ergosterol and in the irradiated products. The process of irradiation effects a different internal structure of the atoms. Irradiation with its consequences, as applied to ergosterol, is not common to all substances, but the witness was unable to say "just how it is brought about."

Dr. Louis B. McSorley, admittedly an expert chemist, identified two chemical formulas (exhibit 2), recognizing one as unirradiated ergosterol, and the other as an irradiated substance, and explained the difference by saying that there are two double bonds in the main structure of the unirradiated ergosterol. The witness defined a "double bond" as "a saturated linking which can be saturated by the addition of further hydrogen."

The oral testimony concerning the effect of irradiation finds support in a recognized text book, "The Pharmacological Basis of Therapeutics" by Goodman & Gilman, wherein irradiation is described as a change in the "internal configuration of the ergosterol molecule," creating new compounds "that are closely related chemically, but show marked differences in their physiological properties."

We find from the record before us that effective irradiation of ergosterol forms a series of new substances, bearing different chemical names and acquiring properties materially different from those possessed by unirradiated ergosterol. It is true, as disclosed by the proof, that the chemical elements—carbons, hydrogen, and oxygen atoms—are the same, *in quantity*, in the irradiated products as in unirradiated ergosterol. For the purposes of the present issue,

however, we are concerned not with the "elements" but with the "properties" of the imported merchandise, for the statutory definition of a drug requires that a commodity to be so classifiable shall have "therapeutic or medicinal properties," paragraph 34, *supra*. Hackh's Chemical Dictionary sets forth very clearly the distinction between an "element" and "properties," as follows:

*element.* Matter which consists of atoms of one type; hence, a substance which cannot be further decomposed by chemical means; a chemical unit or an ultimate constituent of matter.
*properties.* * * * chemical—The chemical behavior of a substance; as, its reactions.

Since the proof herein shows that the internal structure of the chemical elements—carbons, hydrogen, and oxygen atoms—of unirradiated ergosterol imparts no therapeutic property to the substance, the instant merchandise is therefore not a drug within the statutory definition thereof, paragraph 34, *supra*. Hence, plaintiff's claims are without merit. Nor does the commodity in question conform to the statutory interpretation of a medicinal preparation (*United States* v. *Wm. Cooper & Nephews, Inc.*, 22 C. C. P. A. 31, T. D. 47038), as classified by the collector. Being concededly a chemical compound, and not otherwise specially provided for, the product under consideration is properly classifiable under the general provision for such merchandise under paragraph 5, *supra*, and dutiable at 25 per centum ad valorem, the rate applied by the collector.

The protest is overruled and judgment will be rendered accordingly.