(C.D. 2629)

E. DILLINGHAM, INC. *v.* UNITED STATES

---

*To simplify reliquidation, the status of objects said to be represented by the exhibits is summarized as follows:

| Exhibit | Status | | Exhibit | Status |
|---|---|---|---|---|
| 1 | Claim disallowed | | 28 | 20 percent |
| 2 | " " | | 29 | " " |
| 3 | 10 percent | | 30 | " " |
| 4 | Claim disallowed | | 31 | " " |
| 5 | 20 percent | | 32 | Claim disallowed |
| 6 | " " | | 33 | " " |
| 7 | Claim disallowed | | 34 | " " |
| 8 | 10 percent | | 35 | " " |
| 9 | Claim disallowed | | 36 | " " |
| 10 | " " | | 37 | " " |
| 11 | " " | | 38 | " " |
| 12 | " " | | 39 | Not included in protest |
| 13 | " " | | 40 | " " " " |
| 14 | " " | | 41 | " " " " |
| 15 | " " | | 42 | " " " " |
| 16 | 20 percent | | 43 | Claim disallowed |
| 17 | 10 percent | | 44 | " " |
| 18 | Claim disallowed | | 45 | 20 percent |
| 19-A, B | 20 percent | | 46 | " " |
| | | | 47 | 10 percent |
| 20 | Claim disallowed | | 48 | Claim disallowed |
| 21 | " " | | 49 | " " |
| 22 | " " | | 50 | " " |
| 23 | " " | | 51 | 10 percent |
| 24 | " " | | 52 | Claim disallowed |
| 25 | " " | | 53 | " " |
| 26 | " " | | 54 | " " |
| 27 | " " | | 55 | 20 percent |

United States Customs Court, First Division

(Decided March 17, 1966)

*Barnes, Richardson & Colburn* (*Joseph Schwartz, Stanley W. Schroeder*, and *Earl R. Lidstrom* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Samuel D. Spector, Harold L. Grossman*, and *Glenn E. Harris*, trial attorneys), for the defendant.

Before OLIVER, WILSON, and NICHOLS, Judges; NICHOLS, J., dissenting

WILSON, Judge: The merchandise involved in this protest consists of 61 bales of woven tailor's cuttings which was classified by the collector under paragraph 1105(a) of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, T.D. 49753, at the rate of 9 cents per pound as wool waste. This classification was expressly disavowed by the defendant which now contends that the merchandise in question should be classified under the *eo nomine* provision in said paragraph 1105(a), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the rate of 9 cents per pound, as wool rags, not specially provided for. Plaintiff herein claims that the merchandise is properly classifiable under the provisions of paragraph 1555 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the rate of 4 per centum ad valorem, as waste, not specially provided for.

The relevant portions of the tariff act here under consideration are as follows:

Paragraph 1105(a) of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, T.D. 49753:

Wool and hair wastes:

| * | * | * | * | * | * | * |

Wool rags_____ 9¢ per lb.

Paragraph 1105(a) of the Tariff Act of 1930, as modified by Presidential proclamation, T.D. 52739:

Wool and hair wastes:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

 Wool wastes not specially provided for_____ 9¢ per lb.

Paragraph 1555 of the Tariff Act of 1930, as modified by Presidential proclamation, T.D. 52739:

Waste, not specially provided for_____ 4% ad val.

Section 508 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1953, T.D. 53318:

SEC. 508. COMMINGLING OF GOODS.

(a) Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise cannot be readily ascertained by the customs officers (without physical segregation of the shipment or the contents of any entire package thereof), by one or more of the following means: (1) Examination of a representative sample, (2) occasional verification of packing lists or other documents filed at the time of entry, or (3) evidence showing performance of commercial settlement tests generally accepted in the trade and filed in such time and manner as may be prescribed by regulations of the Secretary of the Treasury, and if the consignee or his agent shall not segregate the merchandise pursuant to subsection (b), then the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof.

(b) Every segregation of merchandise made pursuant to this section shall be accomplished by the consignee or his agent at the risk and expense of the consignee within thirty days after the date of personal delivery or mailing, by such employee as the Secretary of the Treasury shall designate, of written notice to the consignee that the merchandise is commingled, unless the Secretary authorizes in writing a longer time. Every such segregation shall be accomplished under customs supervision, and the compensation and expenses of the supervising customs officers shall be reimbursed to the Government by the consignee under such regulations as the Secretary of the Treasury may prescribe.

At the trial, plaintiff produced the testimony of one witness and introduced two exhibits in evidence (plaintiff's exhibits 1 and 2), while the defendant produced four witnesses who testified on its behalf and also introduced 15 exhibits in evidence (defendant's exhibits A through G and defendant's exhibits A-1 through H-1, inclusive). The exhibits will be hereinafter referred to as is deemed pertinent in our determination of the claims herein presented.

Plaintiff's witness, Leon Aronoff, whom the record discloses was the president of the exporting company herein, testified as follows:

That the merchandise in question consists of cuttings, "bits that come off when a garment is produced," which cuttings are purchased from manufacturers of men's garments and boys' clothing (R. 6). There was received in evidence a sample of cuttings which the witness stated was "representative" of some 31 bales weighing 22,765 pounds (plaintiff's exhibit 1, R. 8–9). Another sample also identified as representative of the merchandise in the balance of the importation was received in evidence as plaintiff's exhibit 2 (R. 10). It appears from the record that the cuttings represented by plaintiff's exhibits 1 and 2 were not a part of the shipment at bar and were merely illustrative of the type of merchandise contained in such shipment. Mr. Aronoff stated that exhibit 1 is "practically all cotton" and that "there may be a percentage of wool in exhibit 2." The witness further testified that the merchandise as exported contained a small percentage of wool which it "would not be commercially feasible to extract" (R. 14–15); that he had seen merchandise such as is here involved used in the United States in the manufacture of fiber board, which is used in shoe findings or building board, and in the making of wadding or batting that may be used as mattress stuffing (R. 16–17); that, as far as his experience goes, the involved merchandise cannot be used in the manufacture of cotton, wool, or rayon cloth (R. 17).

On cross-examination, Mr. Aronoff testified that his firm deals in predominantly new cotton and wool cuttings which it supplies to paper mills and woolen mills, and that the merchandise in question was sold to Lowenthal Co., a shredding house and dealer in wool rags and cotton rags (R. 19–21). Plaintiff's witness further testified that wool, after shredding, is referred to as shoddy, which is subsequently manufactured into woolen cloth (R. 21).

Howard Christopher Fay, customs appraiser at Ogdensburg, New York, at the time the entry of the involved merchandise was made, testified for the defendant that he extracted samples from 7 of the 61 bales involved herein; that the bales were uniformly packed and the contents appeared to be fairly uniform; that he took a handful or two of samples from each of the seven bales; that he selected such bales at random, which was the usual method used to take samples of the type of merchandise (R. 36); that the samples were taken from the top, side, and bottom of the bale selected, whichever part was most readily available. The samples in question were received in evidence as defendant's exhibits A through G, inclusive. Mr. Fay further testified that he found the contents of all the opened bales similar in composition and consisting of mixed-up materials as indicated by the extracted samples (R. 44–45).

Mr. William B. Cavanagh, acting customs examiner at the time of the involved importation, testified that he participated in the selection of the samples taken; that a considerable amount of material extracted, specifically such as is represented by defendant's exhibit A, was included in the entered merchandise (R. 47–48). He further testified that the material contained in plaintiff's exhibit 1 does not seem to be similar to the samples extracted from the shipment here involved and that the greater portion of the material contained in plaintiff's exhibit 2 does not seem to be representative of the imported material (R. 50).

Miss Amelia Eaton, analytical chemist at the United States Customs Laboratory in New York, testified on behalf of the defendant that she prepared the various reports represented by defendant's exhibits A–1 through G–1 after analyzing the material contained in the extracted samples, and that she did so in the usual manner employed in such cases. Counsel for the plaintiff conceded that the analysis "as reported in the report is accurate and correct and done in a proper manner" (R. 65).

Abraham Leibowitz, president of Leibowitz Wool Stock Co. since 1932, whose business is "handling woolen rags," also testified for the defendant. He stated that he has been buying and selling rags for over 50 years, his firm having handled from 10 to 15 million pounds of rags per year for the past 40 years (R. 69); he identified defendant's exhibit B, a sample extracted from one of the imported bales, as "Rags," "Lower grade of rags," "cheap rags" (R. 70–72); that these rags are known in the trade as reprocessed wool and are used by woolen mills to make reprocessed cloth for wearing apparel. Mr. Leibowitz stated that, during his experience, such reprocessed wool has always been used that way in the textile industry (R. 73).

After examining certain samples from the imported merchandise, as represented by defendant's exhibits B, C, E, and F, the witness stated that "those pieces of cloth are from a process of cutting larger pieces for making garments." He characterized such pieces as "waste from a manufacturing process" (R. 75), and identified other samples extracted from the imported bales, defendant's exhibits D and G, as well as plaintiff's exhibits 1 and 2, as all very low grade, very cheap rags (R. 76–77). Mr. Leibowitz stated that the price of 4 cents per pound delivered for the involved merchandise as shown on the invoice indicated to him that it was a very low grade waste (R. 78–79). He further testified that he knew of his own personal knowledge that the imported merchandise, as represented by the exhibits at bar, is actually made into garments (R. 79–80), and that such merchandise, referred to by him as waste and as rags, is also referred to as tailor's cuttings or clippings, which the witness stated

was a phrase used in the textile industry prior to and after the year 1930 (R. 80).

The definition of the term "rag" as given by certain lexicographic authorities is noted as follows:

Webster's New International Dictionary, 1958 edition, page 2053:

rag, *n.* 1. a  A waste piece of cloth torn or cut off; a tattered piece of cloth; a shred; tatter.

b  Remnants of used clothing, utilized for paper, lint, shoddy, etc.

Funk & Wagnalls New Standard Dictionary, 1956 edition, page 2043:

rag, *n.* 1.  A fragment of cloth torn or partly torn from its original connection.

Plaintiff and defendant in their briefs have directed our attention to a number of cases, not here referred to, all of which we have reviewed and considered with respect to the present controversy as to whether the involved merchandise is properly classifiable as wool rags, as claimed by the defendant, or whether it should be held classifiable as waste, not specially provided for, as claimed by the plaintiff.

A primary consideration in this case is whether or not there is a presumption of correctness attaching to the collector's classification of the involved merchandise under paragraph 1105(a) of the Tariff Act of 1930, as modified, *supra*, as wool rags.

Plaintiff in its brief maintains that when the collector's classification has been disavowed by the United States, no presumption of correctness attaches to said classification. In such connection, plaintiff directs our attention to the cases of *United States* v. *White Sulphur Springs Co.*, 21 CCPA 203, T.D. 46728, and *International Vitamin Corp.* v. *United States*, 19 Cust. Ct. 76, C.D. 1071. In the *White Sulphur Springs* case, *supra*, the collector classified the involved merchandise as a toilet preparation under paragraph 61 of the Tariff Act of 1930. The importer claimed the merchandise properly dutiable as a medicinal preparation under paragraph 5 of said act, or as medicinal substances by virtue of paragraph 23 of the act, and the issue was presented to the trial court on the basis of the above classification and claims. On appeal, the Government contended that, if the merchandise was not properly classifiable as a toilet preparation under said paragraph 61, it was properly classifiable and subject to the same rate of duty under the same paragraph as bath salts, perfumed, whether or not having medicinal properties.

In its decision, the appellate court in the *White Sulphur Springs* case, *supra*, page 205, stated:

No extensive review of the record seems to be necessary. There is nothing therein tending to show that the merchandise is bath salts.

The appraiser's report does not so designate it, nor did the collector so classify it. His classification was as a toilet preparation. Hence there is no presumption from the classification itself that it is bath salts, and no proof was introduced which even intimates it to be such.

Where a paragraph of a tariff act makes provision for two or more distinctly different kinds of merchandise and the collector of customs specifically classifies an importation as one of those kinds, the legal presumption that such classification is correct attaches, but such presumption of correctness is limited to the specific classification made, and, in case it be found that the merchandise is not such specific kind, it may not be held that there is a legal presumption that it is some other kind which happens to be included in the same paragraph but of which the appraiser gives no description and the collector makes no mention in his classification.

In the *International Vitamin Corp.* case, *supra*, certain merchandise invoiced as "Unirradiated Ergosterol" was classified as a medicinal preparation under paragraph 5 of the Tariff Act of 1930, and assessed with duty at 25 per centum ad valorem. The court, page 77, stated:

\* \* \* When the case was called for trial, Government counsel repudiated the collector's classification with the explanation that the instant merchandise has no therapeutic properties and is not used for medicinal purposes, and consequently cannot be classified as a medicinal preparation. Defendant now contends that the merchandise is classifiable under said paragraph 5 as a chemical compound, not specially provided for, and dutiable at the rate applied by the collector.

\*        \*        \*        \*        \*        \*        \*

Government counsel's concession that the collector's classification is erroneous removes any presumption of correctness ordinarily attached to such official action. The admission by counsel is tantamount to a report by the collector changing his original classification, no longer presumed to be correct. *Smith & Nichols (Inc.)* v. *United States*, 18 C.C.P.A. 16, T.D. 43974. As we review the evidence herein, it will be considered free from any influence usually attached to the collector's classification.

The defendant, in its brief, asserts that the disavowal by it of the classification made by the collector in this case goes only to the presumptive finding that the involved merchandise is "waste" and not to the presumptive finding that it is wool. We do not, however, subscribe to this contention that the concession here made is so limited. In our opinion, based on the holdings of the court in the cases above cited and in view of the concession made by the defendant in this case, the presumption of correctness ordinarily attaching to the classification here made by the collector that the merchandise is properly classifiable as "wool waste" no longer prevails. So for the purpose of our present determination we treat the controversy here as one between the claim by the Government that the involved merchandise is properly classifi-

able under paragraph 1105 (a), as amended, *supra*, at the rate of 9 cents per pound as wool rags, and the claim here made by the plaintiff that the said merchandise is properly dutiable at the rate of 4 per centum ad valorem under the provisions of paragraph 1555, *supra*, as waste, not specially provided for.

Plaintiff, in the case at bar, further maintains that implicit in the court cases holding material to be "wool rags" is a finding that the material involved was *all* wool and not mixtures of various kinds of textiles. Defendant in its brief directs our attention to the holding of the court in *Louisville Bedding Co.* v. *United States*, 14 Ct. Cust. Appls. 328, T.D. 41958.

In the *Louisville Bedding* case, *supra*, the merchandise there involved consisted of certain rags, the component materials of which were wool and cotton. It appeared that, after importation, the rags were shredded and used to stuff mattresses and as journal-box packing, wiping, etc. The record therein disclosed that the wool content of the rags was from 50 to 60 per centum in bulk and was of greater value. The weight of the wool and cotton was about equal, the cotton being warp, and the wool, weft yarns used in weaving the cloth. The rags under consideration in the above-cited case were classified by the collector under paragraph 1105 of the Tariff Act of 1922 as "woolen rags." The importer claimed classification under paragraph 1457 of the act as "waste, not specially provided for." Plaintiff specifically contended therein that the adjective "woolen" signified composed of wool, and, therefore, that the rags in question were not such because only composed in part of wool. In this connection, the court in the *Louisville Bedding* case, *supra*, page 329, stated:

> We think this contention can not be upheld. In common speech, "woolen," may mean made wholly or in part of wool. See New Standard Dictionary. As used in tariff statutes the word "woolen" as describing an article does not necessarily mean composed wholly of wool. When the terms "composed of," "made of," "manufactured of," etc., are used in tariff statutes with reference to the component material of an article, it is sufficient in most cases that the designated article be in chief value of such material. *Kenyon Co.* v. *United States*, 4 Ct. Cust. Appls. 344.

It appears, therefore, that to be "woolen rags" the material need not be wholly of wool. However, it should be noted that the court in the *Louisville Bedding* case, *supra*, stated that "it is sufficient in most cases that the designated article be in *chief value* of such material." [Emphasis supplied.] The defendant in the case at bar urges the court to accept the statements in the laboratory reports (defendant's exhibits A–1 through H–1) as evidence of chief value. It appears that these

reports are based upon percentages by weight. In this connection, reference to the "analyses" made of the merchandise is given below.

A review of the laboratory reports of the analyses of the samples extracted from certain bales of the merchandise discloses the following breakdown by weight of the said material:

| Exhibit | Wool | Viscose rayon | Cotton | Nylon | Acetate rayon |
|---------|------|---------------|--------|-------|---------------|
| A–1 | 5 | 95 | | | |
| B–1 | 72 | 12 | 16 | | |
| C–1 | 88 | 2 | 8 | 2 | |
| D–1 | | 82 | | | 12 |
| E–1 | 79 | 21 | | | |
| F–1 | 73 | 15 | 12 | | |
| G–1 | | 100 | | | |
| H–1 | 48 | 46 | 6 | | |
| Total | 365 | 373 | 42 | 2 | 12 |

In the Summary of Tariff Information, 1929, volume 2, page 1688, which was before the Ways and Means Committee of the House when the Tariff Act of 1930 was being prepared, we find the following:

### WOOL WASTES AND BY-PRODUCTS

Description and uses.—Paragraph 1105 covers the materials which are referred to in paragraph 1103 as wool wastes and wool-waste material. * * *

\*          \*          \*          \*          \*          \*          \*

Woolen rags, the term used in the tariff act, include wool rags containing either worsted or woolen yarns. * * *

Accordingly, it would appear that the term "wool rags" requires inquiry, first, whether the merchandise is wool and second, whether the merchandise is "rags." See, in this connection *United States* v. *J. Eisenberg, Inc.*, 43 CCPA 105, C.A.D. 616.

In the case at bar, defendant's witness Leibowitz in testifying as to whether the merchandise in question was wool rags specifically testified as follows:

Q. Would the fact that it contains 72 per cent wool fibers result in your designating it by any further designation than the mere word "rags"?—A. Rags, in a cheaper quality.

Q. What kind of rags are they?

MR. LIDSTROM: I believe the witness has answered.

THE WITNESS: You made the analysis. You told me 72 per cent wool. It is still cheap rags.

By Mr. Grossman:

Q. Does the fact that it has 72 per cent wool lead to its being given a further designation than merely rags?—A. No, I don't think so. It would be just cheap rags.

Q. Just cheap rags?—A. Right, cheaper commodity.

It will be noted from the above that defendant's own trade witness did not specifically characterize the imported merchandise as wool rags despite persistent probing by Government counsel evidently to elicit a conclusion from the witness that the merchandise in question was the particular type of waste known as wool rags. Even though it was pointed out to the witness that in one case the analysis of the sample extracted disclosed some 72 percent wool fibers, defendant's witness merely testified, as above indicated, that said merchandise was "just cheap rags." On the other hand, the same witness after examining plaintiff's exhibits 1 and 2 and defendant's exhibits B, C, D, E, F, and G agreed that they consisted of waste resulting from a manufacturing process (R. 75–78). As the party claiming that the imported waste was wool, the burden is imposed upon the defendant of establishing that fact by sufficient evidence. In our opinion, defendant in this case has not done so, and its claim that the merchandise is properly classifiable as wool rags should be disallowed.

It appears from the record here presented that the imported merchandise is a "waste." It has been clearly established that the involved pieces of cloth are the snippings from the manufacture of garments. Defendant's witness Leibowitz, as heretofore indicated, after examining the samples in this case, described the merchandise in question as "waste from a manufacturing process" (R. 75). Also, the witness' further statement that the invoice price of 4 cents per pound would indicate that the imported cuttings are a very low grade waste (R. 78–79) appears pertinent. Obviously, wool rags are a type of waste and the defendant, in order to sustain its present claim had the burden of establishing that the imported cuttings are that particular type of waste known as "wool rags." In our opinion, it has failed to do so. The merchandise appears clearly covered by the provision in paragraph 1555, as modified, *supra*, as "Waste, not specially provided for." *United States* v. *C. J. Tower & Sons*, 31 CCPA 185, C.A.D. 271; *Harley Co.* v. *United States*, 14 Ct. Cust. Appls. 112, 114, T.D. 41644.

In our opinion, the defendant in this case has failed to establish that the merchandise at bar is in chief value of wool rags. The percentages of the wool content of the representative samples are, as above indicated, by weight. While the defendant would have us take judicial notice that wool is "inherently" more valuable than either rayon or cotton (the other materials in the imported merchandise), yet, weight

and value can and do differ, and chief value cannot be assumed or established by a mere showing of weight, especially when the showing of weight relates to a very small amount out of a shipment of merchandise weighing over 50,000 pounds. In our opinion, the evidence adduced by the defendant in the case at bar fails to establish that the merchandise in question is a "wool" waste.

The defendant herein also asks the court to invoke the provisions of section 508, *supra*, relative to the commingling of imported merchandise, maintaining that, in this case, the merchandise should be subject to the highest rate applicable for "wool rags" rather than to the lower rate of duty applicable to "waste, not specially provided for." However, in finding as we do above that the defendant on its part has failed to establish that the involved merchandise consists of "wool" rags, and specifically, that it is in chief value of wool, we are of the opinion that the commingling provisions of the tariff act do not apply in the present case. The findings of commingled merchandise by the collector was preliminary to the eventual conclusion on his part that the merchandise was "wool waste" and with the disavowal of the collector's classification in this case, all of the preliminary findings of fact by the collector which tendered toward the collector's classification of the involved merchandise as "wool" waste also fall, and we find the merchandise in question not now subject to the commingling provisions.

On the basis of the record here present, we hold the involved merchandise properly dutiable under paragraph 1555 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the rate of 4 per centum ad valorem as "Waste, not specially provided for," as claimed.

The protest is sustained. Judgment will issue accordingly.

### DISSENTING OPINION

NICHOLS, Judge: I agree with the court, that *dehors* section 508, Tariff Act of 1930, the merchandise is not wool rags and the Government has not sustained the burden the court says it assumed. But because of section 508, I would overrule the protest. This would appear to be a classic case of commingled merchandise under section 508, and the result reached, if it stands, effectively frustrates the intent of the Congress in enacting that provision.

Plaintiff entered the merchandise as "61 bales cotton cutting. For paper making." Only the number of bales was accurate. Our knowledge of what the merchandise is derives just about wholly from the testimony of the Government chemist, Amelia Eaton, her reports exhibits A–1 through G–1, and exhibit H–1. The samples she analyzed

had been duly identified as coming, one from each of seven of the bales in litigation, plus one "composite sample." Plaintiff stipulated that the analysis was "accurate and correct, and done in a proper manner." (R. 65.) Miss Eaton was properly qualified as an expert. (R. 63–65.) It follows that her testimony stands on its own foundation and in no way depends on her status as a Government official. It further follows that whatever damage was done to the presumption of correctness of the collector's decisions by the Government's shift of ground, in no way undermines her testimony and reports, which sustain the burden of proof, if the court rightly says the Government carries the burden.

She found that three of the samples contained wool cuttings wholly of wool. These and other samples contained cuttings of fabric made from wool mixed with cotton, viscose rayon, or nylon. Two samples contained no wool. Four out of the eight samples were 72 percent and up of wool, by weight, mixed and unmixed.

The merchandise consisted of cuttings left over from the manufacture of clothing. Such cuttings, if of wool, were wool rags in the tariff sense. *J. Eisenberg, Inc.* v. *United States*, 46 CCPA 11, C.A.D. 687; *United States* v. *J. Eisenberg, Inc.*, 43 CCPA 105, C.A.D. 616. Three samples contained unmixed wool clippings, and these clippings were "wool rags" beyond peradventure. Several samples contained mixtures of wool and other fibers and it is probable, even if not completely established, that among many of these mixtures, wool was the component material of chief value, in view of the large amount of wool found in the samples, over all, and the admission of plaintiff's president (R. 12) that wool had "a much higher value." Thus they would be "wool rags," too. *Louisville Bedding Co.* v. *United States*, 14 Ct. Cust. Appls. 328, T.D. 41958. However, the three samples containing unmixed wool clippings establish of themselves that section 508 applies, in light of plaintiff's failure to segregate physically or show the proper segregation by documents.

Section 508 itself provides in case of commingling that if the higher duty part is commercially negligible and cannot be segregated without excessive cost, and certain other conditions are also met, the importer can apply to the Secretary to be relieved from performing segregation. Otherwise, he must either segregate or have duty assessed on the whole at the rate applicable to the portion dutiable at the highest rate. The importer here tried to show by testimony that the wool was "commercially negligible," but he never invoked the statutory procedure. If the pure wool clippings were "commercially negligible," plaintiff could have availed himself of the fact only by following the statutory procedure. But there is no reason to suppose they were. The reports

do not say so and no such construction is fairly to be implied. Plaintiff had an opportunity to cross-examine Miss Eaton about this and did not do so. I do not think plaintiff's claim that the wool is negligible is worthy of belief.

Therefore, the presence of the wool rags now is conclusive. It is irrelevant whether the merchandise as a whole is in chief value of wool or wool rags, or which bales are so; if section 508 were so limited there would have been no purpose in enacting it at all. Except in connection with the escape hatches plaintiff failed to employ, comparison of relative value is not needed. The court is not required to speculate and guess what the proportion of higher duty merchandise really was, nor are customs officers required to segregate if the importer fails to do so. *United States* v. *E. E. Holler*, 28 CCPA 124, C.A.D. 133. Whatever the proceedings of the collector, the court should *sua sponte* apply section 508 to the classification of the merchandise if the facts show commingling in the statutory sense; therefore, it is of no importance that the Government abandoned the collector's classification. In *Holler, supra*, one side had contended the merchandise was wholly free, the other that it was wholly dutiable, so neither side invoked section 508, but our appellate court, having held it was partly free and partly dutiable, and commingled, applied section 508 nevertheless to determine that duty must be assessed on the whole. It may seem hard that section 508 should apply to things such as rags, of their nature, almost, commingled, but one of the classic cases, *S. Schapiro & Sons* v. *United States*, 29 CCPA 235, C.A.D. 196, involves commingled rags held dutiable at the highest rate applicable to any part, just as I hold should be done here. The Congress has enacted several different rates applicable to rags, and in cases of commingling, there can be no reasonable doubt it intends us to apply the highest rate applicable to any part, here the wool rags.

The variety of results from different samples establishes that customs officers could not have determined the relative proportion of wool rags without the 100 percent examination from which section 508(a) expressly excuses them. Plaintiff did nothing to help them. He entered the 61 bales under a false description as cotton, though he admitted he knew that 30 of them contained some wool. Even now there is nothing in the record from plaintiff to show which 30 these were. There is nothing in Miss Eaton's reports to suggest that any system of sampling, short of 100 percent would establish with any certainty how many wool rags were in the 61 bales and what percentage they were of the whole.

The court's decision leans heavily on the refusal of defendant's witness Leibowitz to testify that the merchandise was wool rags. I do

not, for these reasons, (a) his testimony as to this is purely advisory since common meaning is a question of law for the court, and (b) his testimony is fairly to be construed as that the samples *as a whole* were not wool rags. This may be fully credited, yet not be inconsistent with the fact that wool rags were commingled within the intent of the law. He was not asked whether any rags found that were 100 percent wool were wool rags. I would readily concede that no one of the 61 bales, taken as a whole bale, would be a good delivery on an order for wool rags, but that is not the test where section 508 is involved.